## Application of FLORIDA TELEPHONE CORPORATION.

Railroad & Public Utilities Commission.

September 1, 1953.

C. Farris Bryant and John Marshall Green, both of Ocala, for applicant.

Lewis Petteway, general counsel, and Guyte P. McCord, Jr., assistant general counsel, Fred Pettijohn, director of commission's accounting department, Roy L. Kearton, commission accountant, P. M. Schuchart, director of commission's public utility department, and J. M. Rogers and Wilkins Linhart, engineers for commission's public utility department, all of Tallahassee, appearing on behalf of the commission and the public.

George Dayton and Charles Luckie, both of Dade County, for city of Dade City.

J. B. Rodgers of Rodgers & Kirkland, Orlando, for city of Winter Garden.

Ellis F. Davis and W. H. Scovell, both of Kissimmee, for city of Kissimmee.

James M. Smith, Jr., Ocala, for city of Ocala.

Wallace E. Sturgis, Sr. and Wallace E. Sturgis, Jr., both of Ocala, for county commissioners of Marion County.

Chairman JERRY W. CARTER, Commissioner WILBUR C. KING and Commissioner RICHARD A. MACK each participated in the hearings and disposition of this case.

BY THE COMMISSION.

### Nature of Proceeding

This proceeding concerns an application filed by Florida Telephone Corporation on February 2, 1953 for authority to increase its rates and charges now in effect for exchange telephone service and various miscellaneous services furnished at Alachua, Apopka, Branford, Bushnell, Clermont, Crystal River, Dade City, Eustis,

Groveland, Inverness, Kissimmee, Leesburg, Live Oak, Mount Dora, Ocala, St. Cloud, Tavares, Umatilla, Winter Garden and Wildwood. In addition, the corporation has requested authority to put into effect the prevailing group rates for common battery and dial exchanges when and if the following exchanges are converted from magneto to the more modern type services: High Springs, Hastings, Crescent City, Williston, Jasper, Mayo, Lake Butler and White Springs.

A pre-hearing conference was held in Ocala on February 17, 1953 by a special examiner appointed by the commission for that purpose. Later, the commission held public hearings on the application on March 2 and 3 in Ocala. Certain protestants represented by three members of the Florida senate objected to the holding of any hearings during the months of April and May of 1953 while the legislature was in session. Under a Florida statute hearings of this kind may not be held if a member of the legislature is participating in the case and he invokes the provisions of the statute. No further hearings were held until July 6, 1953, except one in Kissimmee on March 19, 1953 which did not involve any member of the legislature. Public hearings were held in Winter Garden on July 6 and in Ocala on July 8, 9 and 10. More than 1,000 pages of testimony and 63 documentary exhibits were received by the commission during the course of these hearings. Official notice of these hearings was published in newspapers, printed and circulated in all counties served by the corporation. In addition, notice thereof was forwarded by mail to the mayors, county commissioners and chambers of commerce in all cities, towns and counties served by Florida Telephone Corporation.

### Corporate Structure and Nature of Operations

Florida Telephone Corporation is a corporation organized under the laws of this state on October 1, 1925, and as such is legally qualified to furnish and is engaged in furnishing exchange or local telephone service and intrastate or long distance service in Florida. This utility also, in conjunction with Southern Bell Tel. & Tel. Co., originates and terminates long distance telephone messages. Its operations, therefore, are both interstate and intrastate in character. No separation of the corporation's investment, revenue and expense accounts between these two classes of service has been presented in this case by the utility. At most only a small proportion of its business is interstate in nature and the commission feels that such a separation would have little effect on the overall picture and would not justify the time and expense which such an undertaking involves.

## *Basis of Application for Increased Rates*

The application of Florida Telephone Corporation for increases in its general schedule of exchange rates and charges is based primarily on the assertion that the utility's level of earnings and rate of return has been in a downward trend since 1950, to the extent that its increases in net operating income in 1951 and 1952 have been substantially less than the very substantial increases in interest and carrying charges on the large amounts of securities sold in the same two-year period. The application sets forth that the utility over the past seven years has been engaged in an unusual and abnormal degree of expansion, involving a very substantial amount of gross construction and financing. During that period the applicant's gross investment has increased approximately 388% and its invested capital approximately 336%. The utility contends that it must step up its construction program if it is to meet its obligation to furnish telephone service to the public in its territory and that its decreasing level of earnings coupled with ever increasing costs of money and operating expenses make it necessary for it to adjust its rates and charges upward in order to obtain the earnings required to support further expansion and improvements.

## *Service Complaints*

The file in this docket is filled with complaints about antequated, poor, inadequate and inefficient service. These complaints are from almost every section served by the applicant and run the entire gamut of conceivable telephone disorders. Many of them are from individual subscribers, some are from organizations such as chambers of commerce, and the more formal ones are from the governing bodies of cities, towns and counties.

The city of St. Cloud filed a formal complaint charging Florida Telephone Corporation with rendering inadequate and inefficient telephone service in and around that municipality and requesting that the present rates be reduced commensurate with the type of service being rendered.

The city of Winter Garden filed a formal complaint charging that the quality of service being rendered to the public in that municipality did not justify present rates and requesting appropriate reductions in rates.

The city of Williston filed a formal complaint charging that present rates are excessive and unfair because of the antequated telephone facilities provided in the municipality and the resulting inefficient service.

The city of Kissimmee filed a formal complaint charging the applicant with a long list of inefficiencies, poor service, neglect and improper charges, and requesting appropriate reductions in its general exchange rates and charges.

Formal resolutions complaining about service and facilities were also filed by many other cities and counties but it would serve no useful purpose to multiply these illustrations of public dissatisfaction.

While some cities, such as Ocala and Dade City, filed no formal complaints, they were represented at the hearings by counsel and actively opposed the proposed increases. Marion County also was represented by counsel and was one of the leading protestants at the hearings.

The nature of these many complaints do not appear to have changed very much from those heard by the commission in previous cases involving this utility. They have merely multiplied in number and the complaining parties have become somewhat more dissatisfied and discouraged.

We will discuss this question of poor service and its impact on a rate case of this kind later in this order.

### The Rate Base

The utility has selected the twelve months ended December 31, 1952 as the test year from which its statistical evidence and exhibits are taken in support of the proposed increases in its general schedule of rates and charges, and the commission accepts that period as appropriate for testing its earnings in this proceeding.

The utility has employed a rate base of $5,854,816 to demonstrate that its earnings are insufficient. This rate base was obtained by taking the telephone plant in service at the end of each month beginning with December 31, 1951 and ending with December 31, 1952 and dividing the total thereof by 13 to get the average plant in service for the constructed year. To this average the utility then added the average telephone plant under construction (obtained in the same manner) in the sum of $683,096 and average materials and supplies on hand in the sum of $419,847. From this total it then deducted the average depreciation reserve for the constructed year in the sum of $937,833 leaving a rate base of $5,854,816.

We do not accept the utility's proposed rate base. It is our opinion that a rate base of $5,479,415 is the proper one to be used in this case and will be fair to the utility, its investors and subscribers, giving recognition to every dollar invested in the property used and

useful in rendering the public service. We have arrived at this rate base in the following manner: from applicant's exhibit 15-C we have taken the average telephone plant in service in the sum of $5,689,706 to which we have added the average increase in plant investment brought about by the Ocala conversion in the constructed year in the sum of $434,639. To this we have also added the sum of $15,960 which represents the cost of increases in number of stations from December 31, 1952 to May 21, 1953 at Ocala to give effect to the impact of these additional telephones on applicant's earnings on the theory that they were made available by the Ocala conversion. From the resulting total of $6,140,305 we have deducted $873,377 average reserve for depreciation and $681 for additional depreciation in connection with the additional telephones at Ocala. To the net average plant investment thus obtained in the sum of $5,266,247 we have added $90,362 allowance for cash working capital and the sum of $122,806 allowance for materials and supplies thus arriving at our rate base of $5,479,415. In our opinion this is the reasonable value of the property upon which the utility is entitled to earn a fair return and gives full consideration to the stipulations entered into at the pre-hearing conference. For that reason, we do not feel that it is necessary to discuss the various items such as cash working capital, materials and supplies, and telephone plant under construction.

### Rate of Return

Several years ago we allowed this utility a rate of return of 6% on a rate base somewhat similar to the one we have approved in this case. Since then, however, the cost of money has increased considerably and other elements have entered into the utility field of operation and finance which make such a return inadequate for a utility rendering an efficient and adequate telephone service in a fast growing section of the state. It is our opinion that the applicant, during the economic situation which presently prevails throughout the country, would be entitled to earn a return of 7% per annum on the rate base hereinbefore found to be reasonable *if* the service rendered by it justified rates and charges which would produce such a return. We have previously allowed other telephone utilities an additional return in order to offset the depressing effect of the high cost of construction on the earnings rate. A similar allowance should be made in this case. In the present case the current high cost of construction during the year ended December 31, 1952 increased the average station investment from $269.44 to $274.29 or a percentage increase of 1.80%. Applying this percentage to the 7% return herein found to be fair and reasonable, would give the utility a further return of .13% or a total return of 7.13%.

We have consistently taken the position that public utilities operating in Florida must have earnings which will support the financing of necessary growth and expansion. Public utilities in this state are under dual statutory obligation—*first,* to render an efficient service to present subscribers, and *second,* to provide service upon demand to all those reasonably entitled thereto. It is of course difficult to determine which is the paramount obligation, and yet Florida cannot continue its unprecedented growth, industrially and otherwise, unless her public utilities equip themselves so that they can meet the demands for more and more service in an expanding economy. It would be a short-sighted regulatory policy and a disservice to the public, generally, to hold public utility earnings to such a low level as to discourage and retard necessary growth and expansion. Under such a policy the resulting savings to present subscribers would be far more than offset by the irreparable damage which would result to the overall growth and prosperity of the entire state. We are committed to a ratemaking policy both by inclination and necessity which will not only support but encourage the continued growth and prosperity of all sections of Florida so long as that can be done without imposing unreasonable and exorbitant rates on the public.

### Revenue Requirements

The applicant had, according to its exhibit 12-A, page 1, column 1, an adjusted net operating income of $307,496 for the constructed year ended December 31, 1952. This should be further adjusted by adding thereto the sum of $6,258 which represents additional net operating income due to increased number of stations at the Ocala exchange as of May 31, 1953 which were made available by the Ocala conversion. Thus the applicant's adjusted net operating income for the test period was $313,754. In order to earn a return of 7.13% the utility would require a net operating income of $390,682 for said test period. Its adjusted net operating income was therefore $76,928 less than the amount to which it would have been entitled under the terms of this order. Because of federal income tax requirements, it would be necessary for it to have additional gross revenue in the sum of $160,015 to obtain the additional net operating income of $76,928. In order to produce the additional gross revenue of $160,015 its exchange revenue for the constructed year would need to be increased 18.359%. Were it not for other considerations which must be recognized and are controlling in this case, our finding would be that applicant's revenues from its exchange rates and charges should be increased by 18.359%.

### Effect of Poor Service on Right to Fair Return

If we were concerned with nothing more in this proceeding than the determination of the utility's revenue requirements, our problem would be greatly simplified. However, we are confronted here with a serious question concerning the *quality* of the service which is being rendered by the utility in question. These are not the usual complaints that we hear in rate cases. They are considerably more serious and far reaching and have a most discouraging significance when viewed in the light of applicant's assertion that its gross investment has increased approximately 388% during the past seven years. Complaints about inadequate and inefficient service throughout applicant's entire system have become chronic through the years. As far back as 1947, we found it necessary to criticize this utility severely for the type of service it was rendering to the public.

In October 1947 we reduced applicant's rates at its Apopka exchange 25% because of the poor service rendered the public through its facilities in that municipality.

In 1948 we denied an application for increased rates by this utility purely on the basis of the poor telephone service rendered throughout its system. Later we granted an increase with the hope that the additional revenues which would accrue to it would be translated into improved service to the public. The record in the present case does not support the soundness of that hope nor does it lend much encouragement for the future.

Of course, some improvement has been noted from time to time at a few individual exchanges—still the utility has not achieved throughout its system and in its various exchanges the standards of service desired by the commission and to which the public is entitled. This commission will not tolerate the continued inadequate and inefficient service which this utility has been rendering during the past several years. If it desires to improve its financial situation, then its management must make some drastic improvement in its operating efficiency. Rate increases are not always the answer to a utility's financial problems.

Adequate telephone and communication facilities and services are of paramount importance to the economy of a fast developing community or territory. Important business transactions depend in a large measure on the accessibility of adequate communication facilities. Social intercourse requires a dependable telephone service. The public welfare depends upon the ability of the citizens to communicate with each other through modern methods with the least possible inconvenience and delay. A telephone utility cannot

pre-empt a section or territory through monopolistic franchises without assuming the obligation of furnishing adequate and efficient service in the territory covered by its operating authority. Failure to meet such obligation in a reasonable manner jeopardizes the utility's right to a fair return on the reasonable value of its property devoted to the public service.

This commission has certain obligations and responsibilities in exercising its ratemaking authority. We cannot, in law or in good conscience, authorize increases in utility rates when existing rates are already unreasonably high when measured by the quality of service rendered even though the utility may, in fact, be in serious need of additional revenues.

### *Penalty Reductions Off-set Justifiable Increases*

Were we to authorize a rate increase in this proceeding, which would give the utility a return of 7.13% on the rate base herein found to be reasonable, we would at the same time be forced to impose upon the utility a penalty reduction in its general exchange rates system-wide commensurate with the quality of service presently being rendered to the public by the utility.

The statutes of Florida require public utilities to render efficient service. Rates for public utility services are predicated on the basis of efficient and adequate service and where that service is not kept to that standard, then the rates charged may be graded in proportion to the falling off in efficiency.

The 1953 session of the Florida legislature enacted chapter 28013 which requires all telephone companies to secure certificates of public convenience and necessity which then give the utility the exclusive right to furnish telephone service in the territory covered by the certificate. However, the statute also provides that the commission may grant a *competitive* certificate if it finds that existing facilities are inadequate to meet the reasonable needs of the public or that the existing certificate holder is unable to, or refuses, or neglects to provide reasonably adequate service.

It would serve no useful purpose to prolong this discussion of the applicant's legal obligation to furnish adequate and efficient telephone service and its failure to meet that obligation. While it might be argued that the service rendered at some of applicant's individual exchanges is commensurate with the rates charged or even with the proposed rates, nevertheless we are engaged here in a system-wide rate case and this record will not permit the fixing of rates by individual exchanges. Such an undertaking would require time consuming and expensive separations, allocations and apportion-

ments as to investments, revenues and expenses. We are not equipped either with finances or personnel to cope with the monumental task of fixing rates by local exchanges. Our approach through necessity must be system-wide. Penalty reductions for poor service must also be system-wide when imposed in a general rate case and where the complaints run generally through the system.

A penalty reduction of 25% in applicant's general exchange rates and charges would appear to be justified on the basis of the quality of service presently being rendered.

It is our conclusion that the applicant's net earnings on the basis of presently existing rates are already somewhat in excess of what they would be if the application herein should be granted and a penalty reduction of 25% immediately imposed as indicated.

### *Findings of Law and Fact*

Based upon the entire record herein, the commission finds that—

1. A rate base of $5,479,415 represents the reasonable value of applicant's property used and useful in rendering telephone service and upon which it is entitled to earn a fair return.

2. A return of 7% plus an additional return of .13% to take care of the depressing effect of the current high cost of construction on the earning rate, making a total rate of return of 7.13% on the rate base herein found to be reasonable is fair, reasonable and compensatory and should be allowed if applicant's quality of service warranted rates and charges which would produce such a return.

3. In order to produce a return of 7.13% as aforesaid, applicant's general exchange revenue should be increased by the gross amount of $160,015 or 18.359%.

4. The quality of the service presently being rendered by applicant throughout its system will not justify rates and charges which will produce the return which we have found to be fair and reasonable. A penalty reduction of approximately 25% in applicant's general exchange rates and charges would be fair and reasonable in view of the inadequate and inefficient service presently being rendered.

5. On the basis of applicant's operating statistics, it is entitled to an increase of 18.359% in its general exchange revenue. However, on the basis of the poor service being rendered, applicant should suffer a penalty reduction of approximately 25% in its general exchange revenue. The granting of the one and the imposition of the other simultaneously would give the utility earnings slightly less than it now receives under present rates. The appli-

cation, therefore, should be denied without prejudice to applicant's right to renew the same when it has brought its service up to the standard required by the commission and to which the public is entitled and upon which fair and reasonable rates are predicated.

Now, therefore, in consideration thereof, it is ordered, adjudged and decreed that—

1. The findings of law and fact as hereinbefore set forth, together with the discussion of the various elements and factors involved as contained in the body of this order, be and the same are hereby approved in every respect.

2. The application of Florida Telephone Corporation for an increase in its general exchange rates and charges be and the same is hereby denied without prejudice, however, to the right of said utility to renew its application when it has improved its service to the standard required by this commission and to which the public is entitled.